1
2
3
4
5
6
7
8                   **UNITED STATES DISTRICT COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10

11   WILLIAM HARRIS,                 )  No. CV 05-02673-SS
                                     )
12                  Plaintiff,       )
                                     )  **MEMORANDUM DECISION AND ORDER**
13                  v.               )
                                     )
14   JO ANNE B. BARNHART, Commissioner)
     of Social Security,             )
15                                   )
                    Defendant.       )
16   _____)

17

18                        **INTRODUCTION**

19

20       William Harris (hereinafter "Plaintiff") brings this action seeking

21   to overturn the decision of the Commissioner of the Social Security

22   Administration (hereinafter the "Commissioner" or the "Agency") denying

23   his application for Supplemental Security Income (hereinafter "SSI").

24   Alternatively, he asks for a remand.  On May 12, 2005, the parties

25   consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the

26   undersigned United States Magistrate Judge.  This matter is before the

27   Court on the parties' Joint Stipulation filed on February 14, 2006.

28   \\

(Joint Stipulation ("JS") at 1-15).  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

**PROCEDURAL HISTORY**

On February 7, 2003, Plaintiff protectively filed an application for SSI benefits.  (Administrative Record (hereinafter "AR") 70-75).  He claimed that he became unable to work on June 23, 2002 due to vision and hearing conditions; speech and mental problems; and injuries to the head, neck, arms, legs.  (AR 79).

The Agency denied Plaintiff's application on June 13, 2003.[1]  (AR 56-59).  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge (hereinafter "ALJ").  (AR 60-61).  A hearing before ALJ Robert Evans was conducted on September 21, 2004.  (AR 25-54).  Plaintiff, who was represented by counsel, testified on his own behalf.  (AR 29-44).  A vocational expert (hereinafter "VE") also testified.  (AR 44-53).  On November 24, 2004, the ALJ issued a decision denying Plaintiff benefits.  (AR 11-19).  On February 18, 2005, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner.  (AR 5-7).  Plaintiff subsequently filed his Complaint on April 14, 2005.

\\
\\
\\
\\

---

[1]     This being a prototype case, the next level of review was before an Administrative Law Judge.  (AR 14, 55, 58).

# FACTUAL BACKGROUND

Plaintiff was born on June 6, 1956 and was forty-eight years old at the time of the hearing. (AR 15; 29; 71). He has a high school equivalency diploma (G.E.D.) and his past work experience includes employment as a house painter, a heavy equipment operator and an automobile mechanic. (AR 15, 29-34, 80, 85). Plaintiff alleges that he became disabled on June 23, 2002 due to numerous ailments including vertigo, poor vision, headaches, mental impairments, and pain in his left leg, left wrist, neck and lower back. (AR 29, 38, 40, 71, 79).

In his daily activities questionnaire, Plaintiff asserted that he lived alone in his van. (AR 104). He stated that he tries to "stay out of the van as much as possible" due to fear of being "closed in." (AR 105). Plaintiff also stated that he did not shop often because of his "fear of people." (AR 106). However, Plaintiff also stated that he was able to prepare his own meals and perform household chores. (AR 106).

## A.   Plaintiff's Testimony

Plaintiff testified that his ailments arose after being assaulted with a sledge hammer. (AR 34). Among his numerous ailments, Plaintiff stated that his vertigo and the leg pain (i.e., "from the knee down") were his most severe disabilities. (AR 34). He asserted that his vertigo has caused him to fall down, resulting in further injury to his wrist. (AR 36-37). He also alleged that his leg "gets numb" (i.e., his "foot is asleep and [his] toes are tingling"). (AR 42). In addition, Plaintiff alleged that, due to the pain in his left wrist, he did not

use his left hand often because he "[did not] trust it."[2]   (AR 38). Plaintiff stated that he suffered from constant headaches, which interfered with his concentration.  (AR 37-38).  He testified that the headaches compounded his vision problems, causing him to see "spots" and "flashes."  (AR 38-39).

As for his mental impairments, Plaintiff testified that he had auditory hallucinations, short-term memory impairment, claustrophobia and social anxiety.  (AR 29, 40-42).  He commented that he "get[s] real fidgety" around people.  (AR 42).  Plaintiff stated that he did not seek treatment for his hallucinations because he was not insured.  (AR 41).

Plaintiff opined that he was only able to walk for about 100 feet without resting.   (AR 42).   He alleged that he was unable to continuously stand for more than fifteen or thirty minutes, or continuously sit for more than thirty minutes.   (AR 42-43).   In addition, Plaintiff testified that he was able to lift and carry only "a gallon of water."  (AR 43).

**B.   Treating Physicians' Evaluation**

1.   Harbor-UCLA Medical Center

Plaintiff received medical care and therapy from Harbor-UCLA Medical Center (hereinafter "Harbor") from June 23, 2002 to September

---

[2]   Plaintiff's left wrist was fractured during the assault.  (AR 38).

4

28, 2002.[3]  (AR 113-46).  On June 23, 2002, Plaintiff was transferred from St. Mary's Hospital to the emergency department at Harbor for further evaluations of the head injury suffered during the assault.  (AR 130).  The record indicates that Plaintiff suffered injuries to his head and extremities, including his left knee and left wrist.  (AR 115-18, 120, 128-30, 132-33, 138).  The physician also noted that Plaintiff may be suffering postconcussive syndrome or intoxication and/or withdrawal.  (AR 130).  Furthermore, Plaintiff's social history was noted, in which he asserted that he did not currently use drugs.  However, it appears that he tested positive for amphetamines.[4]  (AR 116 (notation following "drugs"), 130).

Multiple CT scans of the head and an EEG of the brain were conducted, all returning with normal results.[5]  (AR 122, 143, 145).  There was no evidence of intraparenchymal hemorrhage but minimal scalp swelling was present in the mid-frontal region.  (AR 145).  Furthermore, a CT scan of Plaintiff's left knee was performed due to his complaints of pain.  (AR 122).  The doctor opined that the pain was the result of

---

[3]  Plaintiff received medical care from physicians and therapists.

[4]  The record indicates that Plaintiff informed the UCLA emergency department that he is a "former" speed user.  (AR 130). Additionally, the record contains conflicting information as to whether he uses alcohol.  Plaintiff denied consuming alcohol to Dr. Murphy, (AR 130), while to another physician he admitted to doing so.  (AR 136). Still, Harbor's laboratory report indicates that Plaintiff tested positive for less than 5 mg/dL of ethanol.  (AR 142).

[5]  CT scans were conducted twice at Harbor, on June 23, 2002 and on June 24, 2002.  (AR 122).  The record also indicates that a CT scan was performed at St. Mary's, which similarly displayed normal results. (AR 130).

arthritis but determined that acute surgical intervention was unnecessary. (AR 122).

On June 24, 2002, Casie Graham, a speech pathology intern, determined that Plaintiff had reduced language skills (i.e., auditory processing and word retrieval deficiencies). (AR 131). In addition, she noted that Plaintiff's speech was distorted but was still understandable.[6] (AR 131). Ms. Graham assessed that Plaintiff's cognition was "automatic" and therefore appropriate.[7] She opined that Plaintiff's prognosis was "good to reach [the] premorbid level of communication." (AR 131).

Rodica Gudea, a physical therapist, conducted an evaluation on August 2, 2002. (AR 121, 125). Ms. Gudea determined that Plaintiff had passive range of motion in both of his lower extremities. (AR 125). She also noted Plaintiff's complaints concerning lower back pain, which derived from his necessity to limp, due to the pain in his legs.[8] (AR 125). Plaintiff missed his next physical therapy session that was scheduled for August 20, 2002. (AR 119). Thereafter, on September 12, 2002, Ms. Gudea noted that progress had not been made and that Plaintiff

---

[6]   Problems with his denture bridge may have contributed to Plaintiff's speech distortions. (AR 135).

[7]   Plaintiff was assessed a cognition rating of level 7 (out of eight levels). Level 7 is assessed to a person whose cognition is deemed "automatic-appropriate" while level 8 is for one whose cognition is "purposeful-appropriate." (AR 131).

[8]   Plaintiff complained that he now felt pain in both of his legs. (AR 125). This was probably due to Plaintiff's need to overcompensate with his right leg.

6

would be discharged because "[patient] declines to cont. intervention." (AR 119).

On September 28, 2002, Plaintiff returned to Harbor, complaining of pain in his left wrist. (AR 115-18). He asserted that the pain arose after his cast fell off. (AR 116, 118). The x-rays on the wrist returned negative, but the treating physician noted that Plaintiff had a limited range of motion in his left wrist. (AR 115-16). In addition, the physician commented that though Plaintiff's cast fell off five days prior to this current visit, Plaintiff did not seek recasting as instructed by the orthopedic physicians. (AR 116).

        2.   Dr. Salvatore Danna

Dr. Salvatore Danna was Plaintiff's treating physician from October 28, 2002 to July 22, 2004. (AR 197-209). Throughout the course of treatment, Dr. Danna noted Plaintiff's complaints of dizziness. (AR 198-99, 205-08). Dr. Danna also diagnosed Plaintiff with high blood pressure. (AR 208). On April 15, 2003, Dr. Danna noted that Plaintiff had mood swings and was feeling depressed. (AR 207-08). Thereafter, an EEG and MRI of Plaintiff's brain were performed on June 25, 2003 and November 8, 2003, respectively. (AR 203, 206). Both tests returned with normal results. (AR 203, 206).

On September 24, 2003, Dr. Danna commented that though arthritis was forming in the site of Plaintiff's wrist fracture, Plaintiff "ha[d] done remarkably well in the past few months." (AR 204). Dr. Danna noted that Plaintiff was "doing physical therapy on his own and

ambulating continuously throughout the day." (AR 204). Dr. Danna commented that Plaintiff continues to have stiffness and incoordination in the left wrist. (AR 204). However, he opined that Plaintiff should be able function as "an active person...and perform whatever labor he can[,]" for the weakness and incoordination of the wrist were mild. (AR 204).

On December 12, 2003, Dr. Danna diagnosed Plaintiff with cervical strain, vertigo and head trauma. (AR 198). Then, on July 22, 2004, he diagnosed Plaintiff with lumbar disk disease. (AR 198). The record indicates that Dr. Danna planned to inject Plaintiff's L5 nerve root with Depo-Medrol and Sensorcaine (i.e., muscle relaxants and analgesics), due to Plaintiff's complaints of lumbar disk disease and radiculopathy. (AR 198, 202).

### C.   Consultative Evaluations

Plaintiff underwent multiple consultative examinations. On April 14, 2003, Dr. John Sedgh conducted an internal medicine evaluation. (AR 147-53). He commented that Plaintiff was well-developed, well-nourished and in no acute distress. (AR 148). Using the Jamar dynamometer, Dr. Sedgh determined Plaintiff's grip strength to be 110 pounds of force for his right hand and ninety pounds of force for his left hand. (AR 148). Dr. Sedgh opined that Plaintiff's grip was normal. (AR 150). He also found no evidence of synovial thickening or deformities in Plaintiff's

\\

\\

\\

8

wrists.  (AR 150).  Furthermore, the range of motion of Plaintiff's wrists was within normal limits.[9]  (AR 150).

Dr. Sedgh noted that the range of motion of Plaintiff's lumbar spine was limited, with the flexion of 20/90 degrees and extension and lateral flexion of 15/30 degrees.  (AR 149; 151).  X-rays of Plaintiff's lumbosacral spine showed spondylosis, but there was no evidence of compression or other fractures and the pedicles were intact.[10]  (AR 153).  Additionally, Dr. Sedgh found no evidence of muscle spasm or paraspinal tenderness, and the straight-leg-raising test was negative.  (AR 149).  He also determined that Plaintiff's knees were normal, with no evidence of inflamation or deformities and the range of motion within normal limits.  (AR 150).  Moreover, Dr. Sedgh found that Plaintiff's gait was within normal limits.  (AR 151).

Dr. Sedgh also conducted a neurological examination, which revealed that Plaintiff's motor strength in all of his extremities was normal (i.e., 5/5).  (AR 150).  In addition, Dr. Sedgh noted that Plaintiff's cerebellar functioning (i.e., coordination) were intact.  (AR 150).  He also determined that Plaintiff's sensations and vision were grossly intact.[11]  (AR 150).

---

[9]     Dr. Sedgh also found that Plaintiff had full range of motion of the neck.  (AR 151).

[10]    The x-rays also revealed that Plaintiff had atherosclerosis of the abdominal aorta.  (AR 153).

[11]    The visual acuity test revealed that Plaintiff had a corrected vision (i.e., with glasses) of 20/25 when examining both of his eyes together and each eye separately.  (AR 152).

9

Thereafter, Dr. Sedgh opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; could stand and walk for six hours and sit for six hours in an eight-hour workday; and did not have any postural, manipulative or environmental limitations. (AR 151).

On June 5, 2004, Dr. Norma Aguilar conducted a psychiatric evaluation and a mental status examination (hereinafter "MSE") was administered. (AR 178-82). Dr. Aguilar noted that Plaintiff was alert, well-developed, well-nourished and in no acute distress. (AR 179). Plaintiff denied alcohol or drug abuse. (AR 179). Plaintiff was oriented to time, place, person and situation; had normal fund of knowledge, memory, concentration, calculation, abstraction, insight and judgment; and did not have disorganized thinking or looseness of association. (AR 179-80). Though he denied having mood swings, Plaintiff's mood during the examination was noted as being sad and irritable. (AR 179). Dr. Aguilar also recorded that Plaintiff had "poor to disturbed" sleep, poor appetite and occasional anxiety. (AR 179).

Dr. Aguilar noted that Plaintiff denied having hallucinations or delusions, or experiencing suicidal or homicidal ideation. (AR 178, 180). Plaintiff also denied any prior psychiatric hospitalization. (AR 179). He stated that he was "stressed because he [was] [o]n the verge of living in the streets." (AR 178).

\\

\\

\\

10

Thereafter, Dr. Aguilar assessed Plaintiff's Global Assessment of Function (hereinafter "GAF") at 62.[12]  (AR 180).  He diagnosed Plaintiff with adjustment disorder with mixed emotional features and posttraumatic stress disorder.  (AR 180).  Dr. Aguilar opined that Plaintiff could understand, remember and carry out short, simple and detailed instructions; could make judgments on simple work-related decisions; would have mild difficulty interacting appropriately with the public, coworkers and supervisors; could comply with job rules such as safety and attendance; could respond to changes in the routine work setting; and would have mild difficulty responding appropriately to work pressure in a usual work setting.  (AR 180).  He concluded that Plaintiff's prognosis was fair.  (AR 180).

On June 7, 2004, Dr. Sarah Maze conducted a neurological evaluation.  (AR 183-92).  She noted Plaintiff's complaints of weakness in his left arm, vertigo, short-term memory impairment, coordination impairment and fear of being around people.  (AR 184).  Dr. Maze also recorded Plaintiff's statement that he takes daily walks for about twenty (20) miles in order to relieve stress.  (AR 184).  In addition, Dr. Maze commented that Plaintiff appeared tense and gave poor eye

---

[12]  A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000) (hereinafter "DSM IV").

A GAF of 61-70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationship)."  See DSM IV at 34.

contact. (AR 185). However, Plaintiff was oriented to person, place and time, and his attention and concentration were not impaired. (AR 185).

A motor examination of Plaintiff's extremities revealed essentially normal strength. (AR 185). Specifically, Plaintiff's lower left extremities (i.e., left hip flexion, left leg extension, left leg flexion, left foot dorsiflexion, left foot eversion and left foot inversion) were assessed a rating of 5-/5, while his other extremities (i.e., both deltoids, both biceps, both triceps, both wrist extensions, right hip flexion, right extension, right leg flexion, right foot dorsiflexion, right foot eversion and right foot inversion) were given a rating of 5/5. (AR 185). In addition, using the Jamar dynamometer, Plaintiff's grip strength was assessed at 75/75/75 for his right hand and 90/90/90 for his left hand. (AR 185).

A sensory examination revealed that Plaintiff's sensations were intact to light touch, pinprick, temperature and vibration throughout Plaintiff's upper and lower extremities. (AR 186). However, Dr. Maze recorded that the cerebellar functioning of Plaintiff's left side was mildly impaired. (AR 186). Specifically, the finger-nose-finger, rapid alternating movements and rhythmic-toe-tapping tests were performed with slight coarse slowness on Plaintiff's left side. (AR 186). Dr. Maze also noted that Plaintiff ambulated with a slight widened base and was unsteady while performing a tandem walk. (AR 186).

Dr. Maze diagnosed Plaintiff with post-head trauma and opined that Plaintiff had "some slight focal findings." (AR 186). She commented

that "the CT scan did not reveal significant abnormalities after [the] injury." (AR 186). Dr. Maze opined that Plaintiff could lift and/or carry twenty-five pounds occasionally and frequently; could stand and/or walk for about six hours and sit for an unlimited time period in an eight-hour workday; had no limitations in pushing and/or pulling; could climb (ramps, stairs, ladders, ropes and scaffolds) and balance occasionally; could kneel, crouch, crawl and stoop frequently; and had no manipulative, visual, communicative or environmental limitations. (AR 193-96). She reasoned that Plaintiff had exertional and postural limitations due to mild ataxia of the lower extremities. (AR 194).

On April 29, 2003, a physical residual functional capacity[13] (hereinafter "RFC") assessment was completed by Dr. Wilson, a state Disability Determination Service (hereinafter "DDS") physician. (AR 154-62). Dr. Wilson opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; could stand and/or walk for about six hours and sit for about six hours in an eight-hour workday; had no limitations in pushing and/or pulling; could never climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs; could occasionally balance, stoop, kneel, crouch and crawl; had no manipulative, visual, or communicative limitations; and must avoid concentrated exposures to heights (but otherwise had no environmental limitations). (AR 155-58).

\\

\\

---

[13]   RFC is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).

On June 2, 2003, Dr. Mendelsohn completed a psychiatric review technique form but could not make an assessment, due to insufficient data. (AR 163-77). However, he noted that Plaintiff was very agitated and argumentative during two prior psychiatric examinations, and thus the evaluations could not be conducted. (AR 175; 177). Dr. Mendelsohn commented that Plaintiff was diagnosed with postconcussive syndrome but his mental state was cleared while he was at Harbor. (AR 175). Dr. Mendelsohn also noted that Plaintiff was suspected of possible substance intoxication or withdrawal. (AR 175).

**D.    Vocational Expert's Testimony**

Ms. Jeannie Metildi testified at the hearing as a VE. (AR 25-26, 44-53). She asserted that Plaintiff's past positions as a house painter, a heavy equipment operator and an automobile mechanic required medium exertion and were considered to be skilled. (AR 44). The ALJ posed several hypotheticals to Ms. Metildi, including one involving an individual of the same age, education and vocational background as Plaintiff, who could lift about twenty pounds frequently and occasionally; could stand or walk for six hours and sit unlimitedly in an eight-hour workday; could occasionally but not frequently climb stairs and ramps, balance, crouch, crawl, stoop and kneel; could never climb ladders or ropes; and could never work on scaffolds or other unprotected heights. (AR 44-46). Furthermore, the question posed to the VE indicated that the individual could not understand, remember or execution short, simple and detailed instructions; could make judgments on simple work-related decisions; could not understand and follow complex instructions; had mild difficulty interacting appropriately with

14

the public, coworkers or supervisors; could comply with job rules such as safety and attendance; could respond to changes in the work setting; and had mild difficulty responding appropriately to work pressures in a usual work setting.  (AR 46-47).

Ms. Metildi opined that although the individual could not perform Plaintiff's past relevant work, the individual could perform certain unskilled, light work, including work as an office helper and inspector/hand packager.  (AR 47).  Ms. Metildi acknowledged that these jobs required Reasoning Level 2 within the DOT's scale of General Education Development (hereinafter "GED"), whereby one must be able to apply commonsense understanding to carry out <u>detailed</u> but uninvolved instructions.  (AR 49-50, 52).  However, she asserted that the DOT's concept of "detailed" did not require an individual to understand detailed instructions and perform semiskilled work.  (AR 50).  Rather, she testified that these jobs were unskilled, simple work, where an individual did not have to make any difficult decisions.  (AR 51).  Furthermore, Ms. Metildi stated that she had observed many packaging jobs and that they did not involve "detailed" instructions.  (AR 53).

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[14] and that is expected to

---

[14]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties, and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).   The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

16

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1098-99); 20 C.F.R. §§ 404.1520(b) - 404.1520(f)(1) & 416.920(b) - 416.920(f)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54 (citing Tackett, 180 F.3d at 1098). Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1100-01). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

\\

\\

\\

\\

17

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process discussed above.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset of disability.  (AR 18).  At the second step, the ALJ determined that Plaintiff had adjustment disorder with mixed emotional features, posttraumatic stress disorder, left knee and left wrist arthritis, lumbar spondylosis and atherosclerosis.[15]  (AR 18).  These impairments, in combination, were deemed to be "severe."  (AR 18).  At the third step, the ALJ found that the impairments did not meet or medically equal any of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 18).

At the fourth step, the ALJ found that Plaintiff was unable to perform any of his past relevant work.  (AR 19).  This determination was based on the ALJ's finding that Plaintiff retained the RFC to perform a significant range of light work.  (AR 19).  Specifically, Plaintiff could lift twenty-five pounds occasionally and frequently; stand, walk and sit without limitations; climb and balance occasionally; and kneel, crouch, crawl and stoop frequently.[16]  (AR 19).  In addition, Plaintiff

---

[15]   The ALJ mistakenly states that Plaintiff had <u>right</u> knee and <u>right</u> wrist arthritis.  (AR 18).  However, the record shows that the ailments concerned Plaintiff's <u>left</u> knee and <u>left</u> wrist.  (AR 29, 38, 40, 115-18, 130, 147, 204).

[16]   In addition, the ALJ found that Plaintiff was a "younger" individual between the ages of forty-five and forty-nine, had a high school (or high school equivalent) education and had no transferable skills from any past relevant work and/or transferability of skills was not an issue in this case.  (AR 19).

could perform simple, repetitive tasks; could make simple judgments; would have mild difficulty interacting with others; could comply with job safety and attendance rules; could respond to changes in the routine work setting; and would have mild difficultly responding to pressures in the workplace. (AR 18-19).

The ALJ did not accept the consultative examiner's assessment conducted by the internist, but instead gave Plaintiff "the benefit of the doubt and adopt[ed] the more restrictive residual functional capacity assessment of the examining neurologist." (AR 15). However, the ALJ did not fully credit Plaintiff's allegations regarding his limitations because they were not totally credible. (AR 18).

At the fifth step, based on Plaintiff's RFC and the VE's testimony, the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy, such as that of an inspector/hand packager or office helper. (AR 19). Thus, Plaintiff was not disabled at any time through the date of the decision. (AR 19).

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

19

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Reddick, 157 F.3d at 720 (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279).  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

**DISCUSSION**

Plaintiff contends that the ALJ erred for four reasons.[17]  First, he claims that the ALJ's nondisability finding was not supported by substantial evidence. (JS at 3).  Second, Plaintiff argues that the ALJ failed to properly reject Plaintiff's subjective complaints. (JS at 4).  Third, he alleges that the ALJ failed to develop the record. (JS at 5, 9).  Fourth, Plaintiff alleges that the ALJ erred in finding that Plaintiff retained the ability to perform the alternate occupations

---

[17]    The first three issues were raised under a single argument which questioned whether the ALJ's nondisability finding was supported by substantial evidence. (JS at 2).

identified by the VE.  (JS at 10).  The Court disagrees with Plaintiff's contentions.

**A.   <u>The ALJ's RFC Finding Was Supported By Substantial Evidence</u>**

Plaintiff argues that the ALJ's RFC finding was not supported by substantial evidence.  (JS at 3).  He contends that the medical evidence of record supports a more restrictive RFC than that found by the ALJ. (JS at 3).

In determining a claimant's RFC, the ALJ must consider whether a claimant's impairments may disable him to such an extent that he is unable to perform available work.  20 C.F.R. § 404.1523; <u>Light v. Soc. Sec. Admin.</u>, 119 F.3d 789, 793 (9th Cir. 1997).  The ALJ must make the RFC determination based upon medical information in the record plus all other record evidence.  20 C.F.R. § 404.1545(a); <u>see</u> <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1043 (9th Cir. 1995).

Here, the ALJ found that Plaintiff could lift twenty-five pounds occasionally and frequently; stand, walk and sit without limitations; climb and balance occasionally; and kneel, crouch, crawl and stoop frequently.  (AR 19).  In addition, Plaintiff could perform simple, repetitive tasks; could make simple judgments; would have mild difficulty interacting with others; could comply with job safety and attendance rules; could respond to changes in the routine work setting; and would have mild difficultly responding to pressures in the workplace.  (AR 18-19).

The ALJ determined Plaintiff's physical RFC based on a neurological examination conducted by Dr. Maze, who opined that Plaintiff had some "slight focal findings." (AR 15, 186). Specifically, though the cerebellar functioning of Plaintiff's left side was slightly impaired, Plaintiff's right side was normal. (AR 186). In addition, a motor examination testing the strength of Plaintiff's extremities did not reveal any significant impairment. (AR 185). Furthermore, CT scans and EEGs of the brain returned with normal results. (AR 122, 143, 145, 183, 203, 206).

In regard to Plaintiff's left wrist, Dr. Danna opined that the weakness and incoordination in the left wrist were mild. (AR 15, 204). Furthermore, using the Jamar dynamometer, Plaintiff's grip strength was assessed at 75/75/75 for his right hand and 90/90/90 for his left hand. (AR 185).

The ALJ also noted Dr. Sedgh's record that Plaintiff had a limited range of motion in his lumbar spine (i.e., flexion was 20/90 degrees, extension and lateral flexion was 15/30 degrees and straight-leg-raising test was negative). (AR 15, 149). In addition, x-rays of the lumbar spine revealed spondylosis, but the intervertebral disc spaces were not significantly compromised and there was no evidence of compression or other fracture. (AR 153).

In determining Plaintiff's mental RFC, the ALJ noted that Plaintiff did not take any psychiatric drugs, has never been psychiatrically hospitalized, did not have suicidal or homicidal ideation, and did not have any hallucinations. (AR 16, 178-79). The ALJ also noted the MSE

administered by Dr. Aguilar, which revealed that Plaintiff was alert and oriented; had normal speech rate, tone, fund of knowledge, memory, concentration, calculation, abstraction, insight and judgment; and did not have disorganized thinking or looseness of association.  (AR 16, 179-80).  Accordingly, the medical records concerning Plaintiff's alleged physical and mental impairments support the ALJ's RFC finding. As such, no remand is required.

## B.   The ALJ Properly Rejected Plaintiff's Subjective Symptom Testimony As Not Credible

Plaintiff contends that the ALJ erred in finding that Plaintiff's subjective complaints were not credible.  (JS at 4).  Specifically, Plaintiff argues that the ALJ failed to make an "explicit, full and detailed" finding as to credibility, supported by specific, cogent reasons for the disbelief.[18]  (JS at 5-6).  Plaintiff argues that the ALJ improperly isolated parts of the record to support his nondisability finding.  (JS at 5).  He contends that close scrutiny of the record demonstrates the significant limitations in his ability to stand and walk for prolonged periods.  (JS at 5).

_____

[18]   In the Joint Stipulation, Plaintiff initially argued that the "ALJ may not reject [Plaintiff's] subjective allegations solely on the lack of objective medical evidence to fully corroborate the severity of the alleged symptoms."  (JS at 4).  Defendant then responded that the ALJ also considered inconsistencies in Plaintiff's testimony.  (JS at 8).  Plaintiff now contends that the ALJ erred because the "ALJ's sole reason for rejecting [Plaintiff's] subjective complaints was that his activities were incompatible with these complaints."  (JS at 9). Plaintiff is essentially acknowledging that the ALJ based his credibility determination on at least two different reasons.  However, as will be discussed below, the ALJ provided numerous other reasons in discrediting Plaintiff's complaints.

23

Generally, a claimant's credibility becomes important at the stage where the ALJ assesses RFC because the claimant's subjective statements may denote greater limitations than can medical evidence alone. Tonapetyan v. Halter, 242 F.3d 1144, 1147 (9th Cir. 2001) (citing Social Security Ruling 96-7p). However, the ALJ may discredit a claimant's testimony regarding his limitations if the ALJ makes specific findings stating clear and convincing reasons for doing so. See Smolen, 80 F.3d at 1283-84 (citing Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); see also Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (as amended) (explaining that unless there is affirmative evidence showing that the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing"). The ALJ may reject a plaintiff's testimony if he makes an explicit credibility finding that is "supported by a specific, cogent reason for the disbelief." Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (internal citations omitted).

Although the absence of objective medical findings to support the degree of pain cannot be the sole reason to reject subjective complaints, it has been recognized as one valid consideration. See Wainwright v. Sec'y of Health & Human Servs., 939 F.2d 680, 682 (9th Cir. 1991). Other factors that the ALJ may use to discredit a claimant's subjective complaints include the following: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily

activities.  <u>Smolen</u>, 80 F.3d at 1284; <u>see also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002) (listing factors including: (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between his testimony and his conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which the claimant complains) (citing <u>Light</u>, 119 F.3d at 792).

Plaintiff testified that the vertigo and the leg pain were his most severe disabilities.  (AR 34).  He asserted that he experienced episodes of dizziness, which caused him to fall down "quite a bit."  (AR 36-37).  He also alleged that his leg felt numb.  (AR 42).   In addition, Plaintiff testified that he did not use his left hand due to the pain and lack of strength in his wrist.  (AR 38).  He also stated that he experienced pain in his lower back.  (AR 40).  Furthermore, Plaintiff alleged that he suffered from constant headaches, which interfered with his concentration.  (AR 37-38).  He stated that the headaches compounded his vision problems, causing him to see "spots" and "flashes."  (AR 38-39).

In regard to his mental impairments, Plaintiff testified that he experienced auditory hallucinations of "the Lord" speaking to him.  (AR 29).  He also stated that "he forget[s] things real eas[ily]."  (AR 41).  Additionally, Plaintiff asserted that he had claustrophobia, as he felt uneasy in rooms without windows and "real fidgety" around people.  (AR 41-42).

Plaintiff estimated that he was able to walk for about 100 feet without resting. (AR 42). He asserted that he was unable to continuously stand for more than fifteen or thirty minutes, or continuously sit for more than thirty minutes. (AR 42-43). In addition, Plaintiff alleged that he was able to lift and carry about "a gallon of water." (AR 43).

The ALJ cited several reasons for discounting Plaintiff's testimony regarding his mental limitations.[19] (AR 16). For example, the ALJ found that the psychiatric examinations were not consistent with the degree of mental illness expressed by Plaintiff. (AR 16). Dr. Aguilar conducted an MSE and found that Plaintiff was alert, well-developed, well-nourished and in no acute distress. (AR 179). Additionally, Plaintiff's intellectual functioning and sensorium were normal and his reality contact (i.e., hallucinations, confusion, etc.) was similarly normal. (AR 179-80).

---

[19] One of the reasons for the ALJ's discrediting Plaintiff's allegation of disabling mental illness was based on Plaintiff's failure to seek mental health treatment at a free or low-cost clinic. See Smolen, 80 F.3d at 1284. However, Plaintiff's failure to receive mental health treatment is not a substantial basis upon which to reject a claim of mental disability. See Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (quoting Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989) (questioning practice of chastising an individual with a mental impairment for his exercise of poor judgment in seeking rehabilitation)). Nevertheless, as will be elaborated below, the ALJ provided other sufficient grounds for rejecting Plaintiff's subjective allegations. Therefore, to the extent the ALJ's reliance on Plaintiff's failure to seek mental health treatment was error, it was harmless error. See Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1990) (harmless error rule applies to review of administrative decisions regarding disability); Booz v. Sec'y of Health and Human Servs., 734 F.2d 1378, 1380-81 (9th Cir. 1984) (same).

Thereafter, Dr. Aguilar diagnosed Plaintiff with adjustment disorder with mixed emotional features and posttraumatic stress disorder. (AR 179-80). She assessed Plaintiff's GAF at 62 and opined that his prognosis was fair. (AR 180). She concluded that Plaintiff could understand, remember and carry out short, simple and detailed instructions; could make judgment on simple work-related decisions; would have mild difficulty interacting appropriately with the public, coworkers and supervisors; could comply with job rules, such as safety and attendance; could respond to changes in the routine work setting; and would have mild difficulty responding appropriate to work pressure in a usual work setting. (AR 180). The ALJ correctly found that the psychiatric evaluation was inconsistent with Plaintiff's assertions that he could not concentrate, had poor short-term memory and experienced auditory hallucinations. See Light, 119 F.3d at 792 (holding that an ALJ may consider testimony from physicians concerning the nature, severity and effect of the symptoms of which a claimant complains when rejecting subjective testimony). This was a specific, cogent reason for discounting Plaintiff's testimony.

Additionally, the ALJ noted Plaintiff's inconsistent statements regarding the existence of his auditory hallucinations. (AR 16); see Smolen, 80 F.3d at 1284. Though Plaintiff complained of auditory hallucinations at the hearing, he denied any history of such illness during his psychiatric examination, held less than four months prior to the hearing.[20]   (AR 25, 29, 40, 178, 180).   Furthermore, although

---

[20]   At the hearing, Plaintiff asserted that he started to experience auditory hallucinations "[r]oughly about when [he] was in the hospital" (i.e., after the assault in June 2002). (AR 41).

Plaintiff asserts to have complained of his auditory hallucinations to Dr. Danna, the record does not indicate such a complaint.[21]   (AR 198-209).   This was a legitimate reason for discrediting Plaintiff's subjective allegations.

The ALJ also discredited Plaintiff's subjective allegations because Plaintiff's conduct during the hearing was not consistent with a disabling mental illness.   (AR 16); see Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (finding an ALJ's reliance on observations of the claimant at the hearing proper when the claimant's symptoms were inconsistent with the medical evidence and other behavior the claimant exhibited at the hearing).   Though Plaintiff alleged that he suffered from constant headaches, which interfered with his concentration, he was able to sit through the hearing and participate in answering questions. (AR 37-38).

Furthermore, the ALJ discounted Plaintiff's complaints of physical disability (i.e., pain) based on the incompatibility between his complaints and his activities.   (AR 16); see Thomas, 278 F.3d at 958-59.

---

[21]   In his decision, the ALJ noted the inconsistency of reported symptoms by stating that Plaintiff complained of his psychological symptoms only once.   (AR 18).   It appears that the ALJ is crediting Plaintiff's assertion that he complained of auditory hallucinations to Dr. Danna.

In addition, Plaintiff complained of depression only once to Dr. Danna, despite at least fifteen visits.   (AR 16).   However, Plaintiff has complained of mood swings twice.   (AR 207-08).   One of these complaints was made on the same day that he complained of his depression.   (AR 207).   In addition, the record indicates that Plaintiff had previously been diagnosed with posttraumatic stress disorder (i.e., the record for the first day of treatment from Dr. Danna contains the following: "s/p post trauma stress synd.").   (AR 208).

Despite Plaintiff's testimony that he could only walk 100 feet and stand for less than fifteen or thirty minutes, he reported to Dr. Maze that he walked twenty miles per day in an effort to relieve stress.  (AR 184). This admission to Dr. Maze strongly suggests that Plaintiff was not severely limited in his ability to walk or stand.   In addition, on September 24, 2003, Dr. Danna, the treating physician, noted that Plaintiff had been doing "remarkably well in the past few months" and was "ambulating continuously throughout the day."  (AR 204).  The ALJ properly relied on this evidence to conclude that Plaintiff's assertions about his ability to walk were not credible.

The ALJ made an explicit credibility finding that is supported by specific, cogent reasons for the disbelief, as the ALJ has provided numerous reasons for discounting Plaintiff's subjective allegations. Accordingly, the ALJ properly rejected Plaintiff's subjective complaints as not credible.  See Rashad, 903 F.2d at 1231; Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) ("If the ALJ's credibility finding is supported by substantial evidence in the record, [the Court] may not engage in second-guessing.").

### C.   The ALJ Satisfied His Duty To Develop The Record

Plaintiff asserts that the ALJ has an affirmative obligation to seek out an explanation for the inconsistencies between Plaintiff's complaints and his daily activities before using them to discredit him. (AR 5, 9).  As the ALJ here met his obligations and satisfied his duty to develop the record, the Court rejects this claim.

The ALJ has an affirmative duty to fully and fairly develop the record in a social security case.  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  However, the ALJ's duty to conduct an appropriate inquiry or gather additional information is solely triggered by ambiguous evidence or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence.  Id.; see also Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002) (duty not triggered where the ALJ did not make a finding that the medical report was inadequate to make a disability determination); Mayes v. Massanari, 276 F.3d 453 459-60 (9th Cir. 2001) (stating that an ALJ's duty to develop the record is triggered by ambiguous or inadequate evidence in the record).

Here, the ALJ fulfilled his duty to fully and fairly develop the record.  The agency sought all of Plaintiff's treating records.  At the hearing, Plaintiff was questioned about his physical and mental ailments and their impact on his daily life.  (AR 29, 36-44).  In addition, he was asked about his education and past work history.  (AR 29-34).  Plaintiff underwent multiple consultative examinations.  The ALJ then further developed the record by calling a VE to testify and answer several hypothetical questions. (AR 44-53).

Plaintiff does not point to any true ambiguity in the record.  To the extent there were inconsistencies in Plaintiff's testimony, the ALJ properly considered those inconsistencies in his evaluation of Plaintiff's credibility.  There was no uncertainty in the record that would have required the ALJ to do more.  Plaintiff's past medical history and the consultative examinations sufficed to present a full and

clear picture of Plaintiff's impairments.   Accordingly, the ALJ was not required to further develop the record.

   **D.   <u>The ALJ Properly Concluded That Plaintiff Could Perform The Alternative Occupations Identified By The VE</u>**

   Plaintiff contends that the ALJ erred in finding that he retained the ability to perform the alternative work identified by the VE.  (JS at 10).  Specifically, Plaintiff argues that the VE's testimony deviated from the Dictionary of Occupational Titles (hereinafter "DOT") without providing legally sufficient reasons.  (JS at 11).  The Court disagrees.

   At step five of the sequential evaluation, the ALJ has the burden to prove that the claimant is able to make an adjustment to other work.  <u>Bustamante</u>, 262 F.3d at 953-54.  In making his assessments, the ALJ may rely on the VE's testimony that contradicts the DOT if the record contains persuasive evidence to support the deviation.[22]  <u>See</u> <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995).

   According to DOT codes 559.687-074 and 239.567-010, the occupations of an inspector/hand packager and office helper require Reasoning Level 2 (out of a six-point scale), where the claimant must have the mental capacity to perform the following:

_____

   [22]   DOT classifications provide a rebuttable presumption regarding certain jobs and require that the ALJ take notice of the DOT's classifications.  20 C.F.R. § 404.1566(d)(2)-(5)(e).

31

1  Apply commonsense understanding to carry out <u>detailed</u> but
2  uninvolved written or oral instructions.  Deal with problems
3  involving a few concrete variables in or from standardized
4  situations.

6  (JS, Exhs. 2, 3) (emphasis added).

8  The ALJ found that Plaintiff was limited to performing "simple,
9  repetitive" tasks.  (AR 18).  Plaintiff therefore contends that the VE's
10 testimony that Plaintiff possessed Reasoning Level 2 deviated from the
11 DOT, because Plaintiff necessarily lacks the capacity to execute
12 "detailed" instructions.[23]  (JS at 10-11).  Plaintiff acknowledges that
13 the VE may deviate from the DOT.  However, Plaintiff argues that the ALJ
14 did not articulate sufficient bases for the deviation.  (JS at 11).

16 Here, the deviation alleged by Plaintiff does not exist because the
17 reasoning level required of an inspector/hand packager and office helper
18 is consistent with Plaintiff's RFC to perform "simple, repetitive"
19 tasks.  Plaintiff first errs by misreading the DOT's definition of
20 Reasoning Level 2, the second lowest level of reasoning development.
21 Plaintiff assumes that the capacity to carry out "detailed" instructions
22 exceeds that of one who can perform "simple, repetitive" tasks.  To the
23 contrary, the VE affirms that an individual with Plaintiff's

25     [23]  Plaintiff contends that he has the mental capability
26 commensurate with Reasoning Level 1, which requires the ability to apply
   commonsense understanding to carry out <u>simple</u> one- or two-step
27 instructions and deal with standardized situations with occasional or no
   variables in or from these situations encountered on the job.  (JS at
28 10).

32

limitations, as introduced by the ALJ, can perform tasks commensurate with Reasoning Level 2.

In his hypothetical, the ALJ asked the VE, Ms. Metildi, whether an individual possessing Plaintiff's limitations (e.g., one who "[could not]. . . carry[]out short, simple, and detailed instructions," "could make judgments on simple work[-]related decisions" and "would probably not be able to understand and follow complex instructions") could perform other work.[24]   (AR 46-47).   Ms. Metildi testified that such an individual could perform the occupation of an inspector/hand packager or office helper.   (AR 47-48).

The ALJ then asked whether these jobs could be performed by the hypothetical individual even though they involved "detailed" instructions.   (AR 50).   Ms. Metildi responded by stating that the DOT's meaning of "detailed" was different from that of the Social Security regulations.   (AR 50).   The Social Security's definition of "detailed" pertained to work that was complex and semi-skilled.   (AR 18, 50, 52). Conversely, the DOT's definition concerned work that was "standardized, uninvolved, [and] not complicated."   (AR 50).   Furthermore, Ms. Metildi stated that the occupations of an inspector/hand packager and office helper were "unskilled[,]" "simple[,] repetitive jobs" and that they "[would] not vary very much at all."   (AR 51).   She concluded by stating that she had personally witnessed many packaging jobs across numerous

---

[24]   In proffering the hypothetical, the ALJ used the term "detailed instructions" consistent with the Social Security regulations' definition of "detailed," which means complex.   (AR 47, 50).   Therefore, the hypothetical concerned an individual who could not carry out complex instructions but could carry out simple, repetitive tasks.

factories and did not understand why "the DOT [] describ[ed] [those jobs] as detailed." (AR 53). Accordingly, Ms. Metildi opined that these jobs (i.e., those involving the ability to carry out "detailed" instructions according to the DOT) were consistent with the ability to perform "simple, repetitive" tasks. (AR 50-53). As Plaintiff was capable of performing simple, repetitive tasks, the VE testified that she believed he could perform the occupations of an inspector/hand packager or office helper. (AR 47-53). Thereafter, the ALJ adopted Ms. Metildi's testimony. (AR 18).

Plaintiff also fails to account for the qualifier that the DOT places on the term "detailed" as also being "uninvolved." (JS, Exhs. 2, 3). The requirement of being able to carry out instructions that are "detailed but uninvolved" displays the elementary nature of such instructions and reinforces the notion that such a requirement is not as rigorous as Plaintiff alleges.

Although the Ninth Circuit has never reached this issue, other courts have found that a job requiring Reasoning Level 2 is not necessarily inconsistent with a limitation to doing "simple, repetitive tasks." See Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (stating that Reasoning Level 2 appears more consistent with claimant's RFC to "simple and routine work tasks"); Meissl v. Barnhart, 403 F. Supp. 2d 981, 983-85 (C.D. Cal. 2005) (holding that Reasoning Level 2 jobs are consistent with the ALJ's limitation to simple, repetitive tasks); Flaherty v. Halter, 182 F. Supp. 2d 824, 850 (D. Minn. 2001) (holding that DOT's Reasoning Level 2 requirement did not conflict with the ALJ's limitation to "simple, routine, repetitive, concrete, tangible

tasks[,]" as the DOT "specifically caveats that the instructions would be uninvolved-that is, not a high level of reasoning"). Here, the ALJ similarly found Plaintiff's RFC to be limited to "simple, repetitive" tasks and determined that Plaintiff could perform other work that required Reasoning Level 2. (AR 18-19).

Furthermore, Ms. Metildi unequivocally testified that Reasoning Level 2 was consistent with the ALJ's determination that Plaintiff could perform "simple, repetitive" tasks. (AR 50-53). This was based on her expertise as a VE and her observations visiting "many factories and see[ing] many packaging jobs[.]" Moreover, the Ninth Circuit has acknowledged in Johnson v. Shalala that relying on a VE's testimony that a particular claimant can perform a particular work "seems an eminently appropriate use of the vocational expert's knowledge and experience." Johnson, 60 F.3d at 1435. Given the VE's testimony on the minimal level of reasoning required by the occupations of an inspector/hand packager and office helper, the Court finds that the VE's testimony did not deviate from the DOT.

Even if Ms. Metildi's testimony had deviated from the DOT, the outcome would have been the same. As stated above, Ms. Metildi explained that she had personally observed these occupations being performed and knows that the work is simple and repetitive. Ms. Metildi's testimony as to how this work is actually performed would constitute persuasive evidence to support the deviation. See Johnson, 60 F.3d at 1435. Because the outcome would have been the same, any error was therefore harmless. See Curry, 925 F.2d at 1131; Booz, 734 F.2d at 1380-81.

The Court must affirm the Commissioner's decision if it is supported by substantial evidence and if the Commissioner applied the correct legal standards. Id. (citing Tackett, 180 F.3d at 1097). Accordingly, the ALJ did not err in finding that Plaintiff retained the ability to perform other work as an inspector/hand packager or office helper.

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 31, 2006.

_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

36